**2012-1630. -1631**

# United States Court of Appeals
# for the Federal Circuit

Q. I. PRESS CONTROLS, B.V.,

*Appellant,*

*v.*

Teresa Stanek Rea, ACTING DIRECTOR,
UNITED STATES PATENT AND TRADEMARK OFFICE,

*Appellee,*

*v.*

QUAD/TECH, INC.,

*Cross-Appellant.*

*Appeal from the United States Patent and Trademark Office, Board
of Patent Appeals and Interferences in Reexamination No. 95/000,526.*

## BRIEF OF CROSS-APPELLANT QUAD/TECH, INC.

Matthew B. Lowrie
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 342-4000

Brett P. Belden
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
(414) 271-2400

*Counsel for Cross-Appellant Quad/Tech, Inc.*

May 13, 2013

## CERTIFICATE OF INTEREST

Counsel for the Cross-Appellant Quad/Tech, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

Quad/Tech, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Quad/Tech, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Quad/Graphics, Inc. is the parent corporation of Quad/Tech, Inc. and owns a

100% interest.  There are no other parent corporations, and there are no publicly

held companies that own 10% or more of Quad/Tech, Inc.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Matthew B. Lowrie, Brett P. Belden, Matthew A. Smith, and Chase J. Brill

of Foley & Lardner LLP and Steven C. Becker of Becker IP Law, LLC.


May 13, 2013                              /s/ Brett P. Belden
                                          Brett P. Belden
                                          Counsel for Cross-Appellant
                                          Quad/Tech, Inc.

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................v

STATEMENT OF RELATED CASES ................................................. viii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE ..............................................................3

STATEMENT OF THE FACTS .............................................................6

    I.      BACKGROUND ON PRINTING PRESS CONTROL ......................6

    II.     PATENT AT ISSUE – THE '423 PATENT .......................................8

    III.    THE ROSS REFERENCE (U.S. PATENT NO. 6,605,819) ...............9

    IV.   THE MARUYAMA REFERENCE (U.S. PATENT NO. 6,668,144).....................................................................................12

    V.     THE SAINIO REFERENCE (U.S. PATENT NO. 4,887,530) ..........13

    VI.    THE BOARD DECISION .................................................................14

        A.     Rejections of Claims 14 and 24 under 35 U.S.C. § 112 Were Reversed ........................................................................14

        B.     Rejections of Claims 1-17 and 19-60 under 35 U.S.C. § 103 Were Reversed ................................................................15

        C.     Rejections of Claims 61-72 under 35 U.S.C. § 103 Were Affirmed..................................................................................15

        D.    Rejection of Claim 18 under 35 U.S.C. § 112 Was Affirmed..................................................................................17

SUMMARY OF THE ARGUMENT ....................................................17

ARGUMENT ..................................................................................21

I.    STANDARD OF REVIEW AND APPLICABLE LAW ..................21

II.   THE BOARD CORRECTLY REVERSED THE REJECTIONS
      OF CLAIMS 1-17 AND 19-60 UNDER 35 U.S.C. § 103 ................22

      A.   The Board Correctly Held That The Combination of Ross
           and Maruyama Does Not Disclose or Suggest a "Printing
           Press" ...........................................................................23

           1.   "Printing press" is a limiting element of claims 1-
                60, and the Board was correct to consider "printing
                press" in its obviousness determination ........................24

           2.   The Board correctly found that the combination of
                Ross and Maruyama does not disclose or suggest a
                "printing press" ............................................................32

           3.   The Board correctly determined that claims 1-17
                and 19-60 are nonobvious because the combination
                of Ross and Maruyama is entirely missing the
                "printing press" feature of claims 1-17 and 19-60 ........34

      B.   Ross Does Not Disclose or Suggest an Illumination
           Arrangement Adapted to Illuminate the Substrate of the
           Printing Press, That Includes a Plurality of LEDs in a
           Circular Configuration ..............................................36

      C.   Ross and Maruyama Cannot Be Combined As Proposed
           in the Rejections ......................................................40

           1.   Ross and Maruyama disclose systems with
                incompatible principles of operation, and Ross
                teaches away from the principle of operation
                illustrated in Maruyama ................................................41

           2.   Even if Ross and Maruyama were combined, one
                of ordinary skill in the art would not have modified
                Maruyama to place the LEDs around the sensor ...........44

      3.     Modifying Ross to activate the pairs of LEDs together at the same time in a circular configuration would render the sensor head of Ross unsatisfactory for its intended purpose ..................45

      4.     Ross is not analogous art to the claimed invention ........48

      5.     QIPC's own publications provide strong objective evidence of nonobviousness ............................................54

III.    THE BOARD CORRECTLY REVERSED THE REJECTIONS OF CLAIMS 14 AND 24 UNDER 35 U.S.C. § 112 ........................57

IV.    CLAIMS 13-60 ADDED DURING REEXAMINATION DID NOT ENLARGE THE SCOPE OF THE PATENT ...........................59

V.    THE BOARD ERRED BY AFFIRMING THE REJECTIONS OF CLAIMS 61-72 UNDER 35 U.S.C. § 103....................................61

     A.    Ross Does Not Disclose or Suggest the Illumination System Recited in Claim 61......................................................61

     B.    Ross and Sainio Cannot Be Combined As Proposed in the Rejections.................................................................................62

VI.    THE BOARD ERRED BY AFFIRMING THE REJECTION OF CLAIM 18 UNDER 35 U.S.C. § 112 ..........................................64

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................66

CERTIFICATE OF SERVICE .................................................................................67

CERTIFICATE OF COMPLIANCE........................................................................69

# TABLE OF AUTHORITIES

*Page(s)*

***Cases***

*Allen Archery, Inc. v. Browning Mfg. Co.,*
   819 F.2d 1087 (Fed. Cir. 1987) .................................................................54

*Catalina Mktg., Int'l v. Coolsavings.com, Inc.,*
   289 F.3d 801 (Fed. Cir. 2002) ........................................ 24, 25, 29

*CMFT, Inc. v. Yieldup Int'l Corp.,*
   349 F.3d 1333 (Fed. Cir. 2003) ...............................................35

*Consolidated Edison Co. v. NLRB,*
   305 U.S. 197 (1938).................................................................21

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,*
   868 F.2d 1251 (Fed. Cir. 1989) ...................................... 26, 30

*Cybor Corp. v. FAS Techs., Inc.,*
   138 F.3d 1448 (Fed. Cir. 1998) ...............................................21

*In re Alton,*
   76 F.3d 1168 (Fed. Cir. 1996) .................................................21

*In re Baxter Int'l, Inc.,*
   687 F.3d 1357 (Fed. Cir. 2012) ...............................................60

*In re Bigio,*
   381 F.3d 1320 (Fed. Cir. 2004) ...............................................48

*In re Clay,*
   966 F.2d 656 (Fed. Cir. 1992) .......................................... 48, 51

*In re Dembiczak,*
   175 F.3d 994 (Fed. Cir. 1999) .................................................21

*In re Gartside,*
   203 F.3d 1305(Fed. Cir. 2000) ................................................21

*In re Gordon,*
   733 F.2d 900 (Fed. Cir. 1994) ........................................ 45, 46, 47

*In re Icon Health and Fitness, Inc.*,
    496 F.3d 1374 (Fed. Cir. 2007) .................................................48

*In re Klein*,
    647 F.3d 1343 (Fed. Cir. 2011) ........................................ 50, 51

*In re McLaughlin*,
    443 F.2d 1392 (CCPA 1971) .........................................................53

*In re Ratti*,
    270 F.2d 810 (CCPA 1959) ................................................ 41, 43

*In re Royka*,
    490 F.2d 981 (CCPA 1974) ........................................................35

*In re Watts*,
    354 F.3d 1362 (Fed. Cir. 2004) .................................................60

*KSR Int'l v. Teleflex*,
    550 U.S. 398 (2007)...................................................................21

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) ........................................ 25, 26

*Poly-America, LP v. GSE Lining Technology, Inc.*,
    383 F.3d 1303 (Fed. Cir. 2004) ................................... 26, 27, 28

*Power-One, Inc. v. Artesyn Techs., Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010) .................................... 54, 55, 56

*Smithkline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) .................................................60

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983) ........................................ 43, 57

***Statutes***

28 U.S.C. § 1295(a)(4)(A) ..........................................................................1

35 U.S.C. § 103 ............................................................................... *passim*

35 U.S.C. § 141(b) ......................................................................................1

35 U.S.C. § 112 ............................................................................... *passim*

35 U.S.C. § 305 .........................................................................................59

35 U.S.C. § 315(a) ......................................................................................1

35 U.S.C. § 315(b) ......................................................................................1

## <u>STATEMENT OF RELATED CASES</u>

This is an appeal from a decision of the Board of Patent Appeals and Interferences in an *inter partes* reexamination.  No other appeal from the present reexamination has been before this or any other appellate court.

The following cases, identified as related cases by Appellant and all of which are before the United States District Court for the Eastern District of Pennsylvania, involve the same parties, and patents generally related to printing presses, but will not be affected by the outcome of this appeal:

1) *Quad/Tech, Inc. v. Q.I. Press Controls, B.V. et al.*, No. 2:2009-cv-2561.

2) *Quad/Tech, Inc. v. Q.I. Press Controls, B.V. et al.*, No. 2:2010-cv-07248.

3) *Quad/Tech, Inc. v. Q.I. Press Controls, B.V. et al.*, No. 2:2011-cv-2427.

## <u>JURISDICTIONAL STATEMENT</u>

On May 11, 2012, the Board of Patent Appeals and Interferences ("the Board") entered a final Decision on Appeal that reversed-in-part and affirmed-in-part the Examiner's rejections of claims 1-72 in *inter partes* reexamination Control No. 95/000,526.  The Appellant, Q.I. Press Controls, B.V. ("QIPC"), appeals the portion of the Decision on Appeal reversing the rejections of claims 1-17 and 19-60.  The Cross-Appellant, Quad/Tech, Inc. ("Quad/Tech"), appeals the portion of the Decision on Appeal affirming the rejections of claims 18 and 61-72.  Accordingly, this Court has jurisdiction under 35 U.S.C. §§ 141(b), 315(a) and 315(b) as well as 28 U.S.C. § 1295(a)(4)(A).

## <u>STATEMENT OF THE ISSUES</u>

1.      Did the Board correctly reverse the Examiner's rejections of claims 1-17 and 19-60 under 35 U.S.C. § 103(a)?

2.      Did the Board correctly reverse the Examiner's rejections of claims 14 and 24 under 35 U.S.C. § 112?

3.      Did the Board err in affirming the Examiner's rejections of claims 61-72 under 35 U.S.C. § 103(a)?

4.      Did the Board err in affirming the Examiner's rejection of claim 18 under 35 U.S.C. § 112?

## STATEMENT OF THE CASE

This is an appeal from the decision of the Board in an *inter partes* reexamination (Control No. 95/000,526) of U.S. Patent No. 6,867,423 ("the '423 patent"), which is assigned to the Cross-Appellant, Quad/Tech.  (*See* A021, '423 patent.)  Specifically, Quad/Tech appeals from the portions of the Board's Decision on Appeal ("Board Decision") affirming the rejections of claims 18 and 61-72.  (*See* A016, Board Decision at 15.)  Quad/Tech also opposes the appeal of QIPC asking for the Court to overturn the Board's reversal of the rejections of claims 1-17 and 19-60.  (*See* Brief of Appellant ("QIPC Brief").)

Quad/Tech produces technology for controlling and monitoring printing presses used to generate large quantities of publications, such as newspapers or magazines, at high speeds.  Quad/Tech designed a visual inspection system for use with a printing press that includes a unique configuration of light emitting diodes ("LEDs"), such as a circular or rectangular configuration surrounding a recording device, and filed a patent application that eventually matured as the '423 patent on March 15, 2005.  (*See* A021, the '423 patent.)  Quad/Tech later approached the Appellant, QIPC, after it was discovered that QIPC was producing products featuring a ring of LED's around a camera for use with printing presses.  (*See* A714, Corrected Appellant's Brief in *Inter Partes* Reexamination at 16 ("Quad/Tech Board Appeal Brief"), A863, Q.I. Press Controls "Register Focus" at 3.)

QIPC requested reexamination of the '423 patent on January 4, 2010. (A213-253, Request For *Inter Partes* Reexamination.)  The Examiner granted the request and issued a Non-Final Office Action rejecting all issued claims (claims 1-12).  (A311-337, Order Granting Request for *Inter Partes* Reexamination, A342-364, Non-Final Office Action.).  Quad/Tech filed a response amending independent claims 5, 9, and 12 and adding new claims 13-72.  (A369-429, Patent Owner's Response to Office Action and Amendment ("Quad/Tech First Response").)  Each independent claim in the amended claim set recited a specific LED illumination arrangement.  (*See* A372-383, Quad/Tech First Response at 4-15.)  Quad/Tech also submitted a declaration from Quad/Tech Principal Engineer John Seymour providing evidence of nonobviousness and publications in which QIPC itself praised the "ring of LED lighting" included in its own printing press camera product.  (*See* A877-881, Declaration of John Seymour ("Seymour Declaration"), A860-872, QIPC "Register Focus," A875-875, QIPC "Markless Register Control.")

The Examiner subsequently issued an Action Closing Prosecution rejecting all pending claims 1-72 under 35 U.S.C. § 103(a) as allegedly being obvious over U.S. Patent No. 6,605,819 to Ross ("Ross") in combination with various other patent references.  (A561-622, Action Closing Prosecution.)  The Examiner disregarded the Seymour Declaration on the basis that it allegedly was merely

opinion evidence.  (A618-619, Action Closing Prosecution at 57-58.)  The

Examiner also rejected claims 14, 18, and 24 under 35 U.S.C. § 112 as allegedly

lacking support in the written description.  (A567-569, Action Closing Prosecution

at 6-8.)  The Examiner maintained these rejections in a Right of Appeal Notice

mailed on September 24, 2010.  (A628-692, Right of Appeal Notice.)

Quad/Tech appealed the rejections, and the Board affirmed-in-part and

reversed-in-part the decision of the Examiner, as follows:

> 1)     The Board reversed the rejections of claims 1-17 and 19-60
>
> under 35 U.S.C. § 103(a) based on Ross and U.S. Patent No.
>
> 6,668,144 to Maruyama ("Maruyama");
>
> 2)     The Board reversed the rejections of claims 14 and 24 under 35
>
> U.S.C. § 112;
>
> 3)     The Board affirmed the rejections of claims 61-72 under 35
>
> U.S.C. § 103(a) based on Ross and U.S. Patent No. 4,887,530 to
>
> Sainio ("Sainio"); and
>
> 4)     The Board affirmed the rejection of claim 18 under 35 U.S.C. §
>
> 112.

(A001-016, Board Decision.)  Quad/Tech appeals from those portions of the Board

Decision affirming the rejections of claims 18 and 61-72.

## STATEMENT OF THE FACTS

### I.    BACKGROUND ON PRINTING PRESS CONTROL

This case relates to visual inspection systems for printing presses.  Printing presses are gigantic machines that generally are the size of a warehouse.  These presses are used to print very large amounts of publications, such as newspapers or magazines, in a short period of time.  Many people are familiar with a typical printing press in the context of movies in which a newspaper reporter yells "stop the presses" and a large machine printing the next day's newspaper is brought to a halt for a breaking story.

These movies often feature a type of press called a web offset printing press. The '423 patent describes such a high-speed, web offset printing press in which a "web," or roll of paper, is fed through several printing units, each of which is designed to imprint the paper with a different color ink.  (*See* A026, '423 patent, 1:13-30, A028, '423 patent, 6:49-50.)  The paper is fed through a first printing unit that imprints the paper with black ink, a second printing unit that imprints the paper with red-colored magenta ink, a third printing unit that imprints the paper with blue-colored cyan ink, and a fourth printing unit that imprints the paper with yellow ink.  (A027, '423 patent, 3:1-12.)  These four colors combined result in the final printed image.  (*Id.*)  Afterwards, the paper (or "web") is cut into the individual pages of the newspaper or magazine.  An example illustration of such a

web offset printing press is provided in Figure 1 of the '423 patent:



(A022, '423 patent, Fig. 1.)

Control of these enormous printing presses involves substantial challenges related to the high rate of speed at which monitoring must be performed. (*See* A877-881, Seymour Declaration.) For example, the roll of paper can travel at speeds in excess of 3,500 feet per minute. (A028, '423 patent, 6:49-50.) Moving the paper at this high rate can cause movement of the paper relative to the surface applying the ink. (A878, Seymour Declaration at ¶ 12.) Because separate surfaces apply separate colors of ink, this movement can cause misalignment between colors. Even a very slight misalignment of two layers of differently colored ink (e.g., on the order of 0.001 inch) can be visible to the human eye and commercially unacceptable. (*Id.*)

To measure misalignment of as little as 0.001 inches, the resolution of an image captured by a visual inspection system must also be on the order of 0.001 inch. (A879, Seymour Declaration at ¶ 13.) At 3,000 feet per minute and 0.001

inch resolution, a visual inspection system has no more than 1.7 microseconds to

capture an image.  (A879, Seymour Declaration at ¶¶ 13-14.)

## II.    PATENT AT ISSUE – THE '423 PATENT

The '423 patent relates to a visual inspection system and associated

illumination arrangements for a printing press.  (A021, '423 patent, abstract).  The

visual inspection system may be used to monitor the paper for various purposes,

such as controlling the color levels being printed by the printing press or the

alignment of the paper on the printing press.  (A026, '423 patent, 2:18-26.)

The visual inspection system of the '423 patent includes a unique

illumination arrangement, with multiple LED's arranged in a specific manner.

(A027, '423 patent, 4:62-67.)  In the example shown in Figure 3 of the '423 patent,

the LEDs are arranged in a circular configuration around the lens of the camera:



(*See* A022, '423 patent, Fig. 3, A027, '423 patent, 4:62-65.)

8

Claim 11 recites an illumination arrangement comprising "a plurality of high intensity LEDs arranged in a circular configuration surrounding the recording device." (A846, Quad/Tech Board Appeal Brief at 49.) Each of the other independent claims, claims 1, 3, 5, 7-10, 12, and 61, also recite a particular arrangement of LEDs. (*See* A844-853, Quad/Tech Board Appeal Brief at 47-56.)

## III.  THE ROSS REFERENCE (U.S. PATENT NO. 6,605,819)

United States Patent No. 6,605,819 ("Ross") was cited as a secondary reference, in combination with either of the primary references Maruyama or Sainio, in the rejections of each of the independent claims under 35 U.S.C. § 103(a). (*See* A628-692, Right of Appeal Notice.) Every claim rejection under § 103 relies on Ross as allegedly teaching the illumination arrangements recited in the independent claims. (*See id.*)

Ross discloses a system for scanning banknotes, such as U.S. Dollar bills, in an automated teller machine ("ATM") to verify that the banknotes are genuine. (A182, Ross, 2:12-22, A183, Ross, 4:1-4.) Ross illuminates the bill with four separate pairs of LEDs, each LED in the pair having the same color, and each pair being a different color than the other pairs and used at a different time than the other pairs. (A184, Ross, 5:13-17, 6:35-49.) This way, the system collects sample data based on the reaction of the bill to each different wavelength of light associated with each different LED pair. (A183, Ross, 3:10-14, A184, Ross, 5:13-

17, 6:35-49.)  The sample data is compared against data obtained from a genuine

bill to determine whether the scanned bill is genuine.  (A183, Ross, 3:8-9.)

The reference explains:

> A sensor head is provided, which includes a photo sensor
> and four paired LEDs, two each producing light of red,
> green, blue, and infra-red wavelengths. A banknote to be
> tested is located in the path of the sensor head, and a first
> pair of LEDs (for example, the red pair) is activated. A
> spot on the banknote is illuminated, and the intensity of
> diffusely reflected red light is detected by the photo
> sensor, and recorded in a computer processor memory.
> The note is then moved forward a short distance, and the
> second pair of LEDs is activated. This is repeated until
> the whole length of the banknote has been illuminated.
> Each illumination is performed after the note has moved
> through a specified distance; and the duration of each
> illumination is controlled by a timer incorporated in the
> system.

(A184, Ross, 5:13-17, 6:35-49.)  The pairs of LEDs are preferably diametrically

opposed from one another, as illustrated in Figure 1b of Ross:



(A179, Ross, Fig. 1b; text labels added.  *See also* A185, Ross, 7:45-48.)  Ross

states that each pair of LEDs is pulsed for a fixed time period, and intervals are

provided between pulses of different pairs of LEDs to allow for movement of the

banknote through the ATM:

> The clock 24 and PLL 26 interact to drive the LEDs such
> that each pair of LEDs is pulsed in turn for a fixed time
> period, with the intervals between pulses varying,
> dependent on the transport speed of the media. That is,
> the pulses are generated as the media moves through
> equal distances, not necessarily at equal time intervals.
> This ensures that the distance between each sample taken
> is fixed; the duration of each pulse must be fixed to allow
> each LED to fully activate on each pulse.

(A185, Ross, 7:62 – 8:3.)  Because the note is moving and the LEDs pairs fire at

different times, the data for each pair/color is taken at different places on the bank

note.  That is, no two pairs ever illuminate the same place on the note.

Thus, Ross repeatedly and consistently refers to each pair of LEDs as a

**separate, distinct light source that is activated independently and at separate**

**times and on separate positions of the bill** from the other pairs of LEDs:

- "Preferably, a plurality of distinct monochromatic light
  sources is provided.  Conveniently, four distinct
  monochromatic light sources are provided.  In a preferred
  embodiment of the invention, separate red, green, blue, and
  infra-red light sources are provided."  (A183, Ross, 4:55-
  59.)

- "Preferably each distinct monochromatic light source is
  activated in a predetermined sequence."  (A183, Ross, 3:21-
  22.)

- "A banknote to be tested is located in the path of the sensor
  head, and a first pair of LEDs (for example, the red pair) is
  activated … [t]he note is then moved forward a short

distance, and the second pair of LEDs is activated." (A184, Ross, 6:38-45.)

- "The clock 24 and PLL 26 interact to drive the LEDs such that each pair of LEDs is pulsed in turn for a fixed time period, with the intervals between pulses varying, dependent on the transport speed of the media." (A185, Ross, 7:62-65.)

(*See also* A184, Ross, 5:13-17, A186, Ross, 10:16-17.)

Each pair of LEDs is used to collect sample data based on the reaction of the bill to a different wavelength of light. (A183, Ross, 3:10-14.) The sample data is compared against data obtained from a genuine bill to determine whether the scanned bill is genuine or counterfeit. (A183, Ross, 3:8-9.) Using sample data corresponding to different wavelengths/colors of light, rather than just a single wavelength/color, purportedly allows the system of Ross to conduct a more rigorous analysis than use of a single wavelength. (A183, Ross, 3:12-14, 3:46-57.)

## IV.    THE MARUYAMA REFERENCE (U.S. PATENT NO. 6,668,144)

United States Patent No. 6,668,144 ("Maruyama") is the primary reference that was combined with Ross in the rejections of claims 1-60 under 35 U.S.C. § 103(a). (*See* A639-684, Right of Appeal Notice at 9-54.) Maruyama discloses printers such as a photocopier or a laser printer. (A196, Maruyama, 1:8-13.) The Maruyama printer uses an imaging system to detect the "properties" of "recording sheets" (e.g., thickness of a sheet of paper) so that it can adjust settings for printing (e.g., the speed that the sheet is passed through the printer). (A197, Maruyama, 3:59 – 4:2., A198, Maruyama, 6:47-52.)

12

To do this, light from a single LED is applied at an angle to the surface of the sheet, and reflected light from the recording sheet is imaged onto a sensor. (A197, Maruyama, 4:30-42.)  The pictures read by the sensor are digitally processed to analyze the sheets.  (A197-198, Maruyama, 4:66 – 5:2.)

As a result of this arrangement, the single LED is located on one side of the area being illuminated and the camera is located on the opposite side:



*FIG. 2*

(A191, Maruyama, Fig. 2.)

## V.    THE SAINIO REFERENCE (U.S. PATENT NO. 4,887,530)

United States Patent No. 4,887,530 ("Sainio") is the primary reference that was combined with Ross in the rejections of claims 61-72 under 35 U.S.C. § 103(a).  (*See* A684-690, Right of Appeal Notice at 54-60.)  Sainio is assigned to Quad/Tech and discloses a web-fed printing system having a registration control system.  (A130, Sainio, 3:28-32.)  A single high-intensity lamp is used to illuminate portions of the web where registration marks are printed, and line scanner units are focused on the illuminated portion of the web and used to scan the registration marks.  (A130, Sainio, at 4:37-59.)

## VI.    THE BOARD DECISION

The Board reversed-in-part and affirmed-in-part the rejections of the Examiner.  (A016, Board Decision at 15.)  Specifically, the Board: (1) reversed the rejections of claims 14 and 24 under 35 U.S.C. § 112, first paragraph; (2) reversed the rejections of claims 1-17 and 19-60 under 35 U.S.C. § 103(a); (3) affirmed the rejections of claims 61-72 under 35 U.S.C. § 103(a); and (4) affirmed the rejection of claim 18 under 35 U.S.C. § 112, second paragraph.

### A.    Rejections of Claims 14 and 24 under 35 U.S.C. § 112 Were Reversed

The Board reversed the rejections of claims 14 and 24 under 35 U.S.C. § 112, first paragraph.  (A006, Board Decision at 5.)  Claims 14 and 24 recite that "the LEDs are disposed between the sensor and the substrate of the printing press." The Board determined that this feature is disclosed in Figures 2 and 3 of the '423 patent.  (*Id.*)  The Board rejected QIPC's assertion that the recited configuration of LEDs would cause the visual inspection system not to function, noting that the argument is irrelevant to the question of whether the written description requirement is met and, in any event, QIPC had failed to demonstrate why the configuration would cause the visual inspection not to function.  (*Id.*)

14

**B.     Rejections of Claims 1-17 and 19-60 under 35 U.S.C. § 103 Were Reversed**

The Board also reversed the rejections of claims 1-17 and 19-60 under 35 U.S.C. § 103(a) based on Ross and Maruyama, in combination with other references.  (A007-009, Board Decision at 6-8.)  The Board held that the combination of Ross and Maruyama does not disclose or suggest a visual inspection system in communication with a substrate of a "printing press."  (A008, Board Decision at 7.)  The Board noted that the copier or laser printer device of Maruyama is not a "printing press" as would have been understood by one of ordinary skill in the art, stating that "Respondent has not demonstrated that merely printing images on paper or moving the paper past stations would have indicated a 'printing press' to one or ordinary skill in the art."  (*Id.*)

**C.     Rejections of Claims 61-72 under 35 U.S.C. § 103 Were Affirmed**

The Board affirmed the rejections of claims 61-72 under 35 U.S.C. § 103(a) based on Ross and Sainio.  (A009-015, Board Decision at 8-14.)  The Board found that Sainio discloses a printing press and Ross discloses a ring of LEDs and opined that combining Ross and Sainio would have been obvious to one of ordinary skill in the art in view of an alleged desire for a high amount of illumination and multidirectional lighting.  (A010-012, Board Decision at 9-11.)  The Board cited portions of the Seymour Declaration discussing challenges associated with printing

press control and benefits provided <u>by the '423 patent</u> as allegedly supporting its finding of obviousness. (*Id.*)

In holding that the ATM machine in Ross discloses a ring of LEDs and that the combination with a large commercial printing press would not destroy the function of the LEDs in Ross, the Board interpreted the intended purpose of both Sainio and Ross extremely broadly as "illuminating an object." (A013, Board Decision at 12.) The Board did not acknowledge or address the teaching of Ross that only a single pair of LEDs is activated at a time. (*See* A184, Ross, 5:13-17, 6:35-49.) Further, the Board Decision is silent regarding the intended purpose of activating the separate pairs of LEDs in Ross at different times and on different portions of the banknote, which is to generate sample data corresponding to different colors/wavelengths of light for use in verifying whether a banknote is genuine. (*See* A183, Ross, 3:8-14.)

The Board also declined to weigh objective evidence of nonobvious in the form of laudatory statements made by QIPC about its own product, extolling the performance of its "ring of LED lighting." (A014-015, Board Decision at 13-14.) The Board cited only select portions of the publications, asserting that the praise was directed generally to LED lighting and a new generation of camera, and held that the required nexus was not established on the basis that the praised features stem from what was known in the prior art. (A014-015, Board Decision at 13-14.)

16

The Board did not cite the portions of the QIPC publications making laudatory statements specifically directed to the value of a ring of LED lights.

### D.    Rejection of Claim 18 under 35 U.S.C. § 112 Was Affirmed

The Board also affirmed the rejection of claim 18 under 35 U.S.C. § 112, second paragraph, on the grounds that Figures 1 and 2 of the '423 patent do not disclose that the substrate (e.g., the paper) is unsupported at a point where the substrate is configured to be illuminated by the illumination arrangement.  (A007, Board Decision at 6.)  The Board Decision did not address the illustration of the substrate in Figure 2 of the '423 patent, in which the substrate is shown without rollers or other structural elements supporting the substrate at the point where the illustrated illumination system illuminates the substrate.  (*See id.*)

### SUMMARY OF THE ARGUMENT

This Court should affirm-in-part and reverse-in-part the decision of the Board.  The Board properly determined that claims 14 and 24 have adequate support in at least Figures 2 and 3 and the corresponding passages of the written description of the '423 patent, and the portion of the Board Decision reversing the rejections of claims 14 and 24 under 35 U.S.C. § 112, first paragraph, should be affirmed.

The Board also properly reversed the rejections of claims 1-17 and 19-61 under 35 U.S.C. § 103(a) based on Ross and Maruyama, and the Board Decision should be affirmed in this regard.  The Board correctly determined that "printing

17

press" (or systems suitable for printing presses) is limiting because the independent claims refer to a printing press in the body of the claims, as structurally characterizing claim limitations (except for claims 1, 9, and 11, where the printing press is the antecedent basis for "substrate" and/or "recording device," which appear in the body of the claims). What is more, the specification's repeated unequivocal emphasis on printing presses also compels the conclusion that the claim preamble is limiting, in accordance with the case law of this Court.

The Board also correctly held that Ross and Maruyama, alone or in combination, do not disclose a "printing press" (or systems suitable for printing presses) as would have been understood by one of ordinary skill in the art. (A008, Board Decision at 7.) QIPC does not appear to claim otherwise.

Even if the combination of Ross and Maruyama were deemed to disclose a printing press (it does not) or if "printing press" does not pose any limitation in the claims (it does), claims 1-17 and 19-61 would still be patentable over the cited combination of references. The Ross ATM machine does not teach a visual inspection system with the types of LED arrangements (e.g., circular arrangement around a recording device) recited in the claims of the '423 patent. Instead, Ross discloses a system that includes four "distinct monochromatic light sources," each including a pair of diametrically opposed LEDs, which are only operated separately from one another.

Further, the Ross ATM machine and Maruyama paper sensor cannot be properly combined and modified because:

1)    Ross and Maruyama teach incompatible principles of operation, and Ross teaches away from the proposed combination.  Maruyama teaches direct, oblique reflection of light from a single LED into a sensor, while Ross repeatedly emphasizes the use of only diffuse reflection of light from a single color pair of LEDs into the detector of Ross.

2)    Even if Ross and Maruyama were combinable, one of ordinary skill in the art would not have modified Maruyama to provide the LEDs around the sensor as proposed by the rejections.

3)    Modifying the system of Ross to activate multiple pairs of LEDs at once in a circular arrangement, rather than a single pair at a time as is taught by Ross, would render Ross unsatisfactory for its intended purpose of collecting reflection data at different wavelengths corresponding to each individual monochromatic pair of LEDs and at different locations on the bank note.

4)    Ross is nonanalogous art because an inventor would not have looked to the banknote scanning system of Ross in view of the different technical challenges unique to inspection of printing presses and the very different solution to a different problem taught by Ross.  The system of Ross

is designed to activate the pairs of LEDs separately to allow the system to collect data about the response of the banknote to the different wavelengths of light associated with each pair of LEDs. The LED pairs are not designed to be activated together to increase an amount of illumination.

5)     The laudatory statements made by QIPC in the publications promoting its own product are strong objective evidence of nonobviousness with a direct nexus to the claimed illumination arrangements.

The Board erred in affirming the rejections of claims 61-72 under 35 U.S.C. § 103(a) based on Ross and Sainio, and the portions of the Board Decision affirming the rejections of claims 61-72 should be reversed. Despite the fact that Sainio discloses a printing press, claims 61-72 are patentable over Ross and Sainio for many of the same reasons discussed above with respect to the combination of Ross and Maruyama. Ross does not teach the "illumination system comprising a plurality of LEDs that are disposed in a configuration surrounding the optical communication path" recited in independent claim 61. Ross and Sainio are also not properly combinable for several of the same reasons that Ross and Maruyama cannot be combined.

The Board also erred in affirming the rejection of claim 18 under 35 U.S.C. § 103(a) because Figures 1 and 2 of the '423 patent provide adequate support for the features recited in that claim.

## ARGUMENT

### I.    STANDARD OF REVIEW AND APPLICABLE LAW

Whether a claimed invention is unpatentable as obvious under 35 U.S.C.

§ 103 is a question of law based on underlying findings of fact. *In re Gartside*, 203

F.3d 1305, 1316 (Fed. Cir. 2000). The ultimate conclusion regarding obviousness

is reviewed *de novo*, while the underlying facts are reviewed under the substantial

evidence standard. *Id.* Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.* at 1312

(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Claim

construction is a legal issue that is subject to *de novo* review. *Cybor Corp. v. FAS

Techs., Inc.,* 138 F.3d 1448, 1451 (Fed. Cir. 1998). Underlying facts for a legal

conclusion as to obviousness include the scope and content of the prior art, the

level of ordinary skill in the art, the differences between the claimed invention and

the prior art, and objective evidence of nonobviousness. *Id.* at 1319 (quoting *In re

Dembiczak*, 175 F.3d 994, 998 (Fed. Cir. 1999)). The issue of whether a patent

specification adequately describes the subject matter claimed is also a question of

fact. *In re Alton*, 76 F.3d 1168, 1171-72 (Fed. Cir. 1996).

In *KSR Int'l v. Teleflex*, the Supreme Court rejected a rigid approach to the

question of obviousness. 550 U.S. 398 (2007). At the same time, however, the

Supreme Court recognized that "inventions in most, if not all, instances rely upon

building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *Id.* at 418-19. Thus, a patent composed of several elements "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418. Therefore, there must be an articulated reasoning with a rational underpinning to support a legal conclusion of obviousness. *Id.*

## II.    THE BOARD CORRECTLY REVERSED THE REJECTIONS OF CLAIMS 1-17 AND 19-60 UNDER 35 U.S.C. § 103

The Board held that the rejections of claims 1-17 and 19-60 under 35 U.S.C. § 103(a) were improper based on the underlying factual determination that the combination of Ross and Maruyama does not disclose or suggest a "printing press" (or an illumination structure suitable for use in one), as would have been understood by a person of ordinary skill in the art.  (A008, Board Decision at 7.) This factual determination of the Board is supported by substantial evidence and should not be overturned by the Court.

Even if this Court determined that Maruyama discloses a printing press or that the claims are not limited to systems structurally suitable for use in a printing press, claims 1-17 and 19-60 would still be patentable over the combination of Ross and Maruyama, alone or in further combination with the other references cited in the various rejections applied to claims 1-17 and 19-60.  Ross does not disclose or suggest the illumination arrangements (e.g., a single illumination

system of LEDs in a circular configuration; see, for example, claims 1 and 11) recited in claims 1-17 and 19-60, but rather discloses a system that activates four distinct illumination systems (pairs of LEDs) at different times and on different positions of a banknote, as the banknote travels through an ATM.  At no time or place is a singular, circular illumination ever done.  The proposed combination of Ross and Maruyama also is improper for several reasons.

### A.   The Board Correctly Held That The Combination of Ross and Maruyama Does Not Disclose or Suggest a "Printing Press"

Each of the Examiner's rejections of claims 1-17 and 19-60 relied on Maruyama as allegedly disclosing a visual inspection system for use with a "printing press."  In reversing the rejections of claims 1-17 and 19-60 under 35 U.S.C. § 103(a) based on Ross and Maruyama, the Board stated as follows:

> Appellant argues that "neither Maruyama nor Ross ... disclose ... or suggest ... a **printing press**" (App. Br. 28). We agree with Appellant. Maruyama discloses "[a]n image forming apparatus such as a copier or a laser printer" (col. 1, ll. 12-13) and Ross discloses a system "for media recognition, validation and screening" (col. 1, ll. 28-29). The Examiner has not demonstrated that the combination of Maruyama and Ross also discloses or suggests a visual inspection system in communication with a substrate of a printing press as required by claim 1.
>
> The Respondent argues that Maruyama "prints an image on paper by moving the paper past or through a plurality of color printing or processing stations" (Respondent Br. 12) but does not provide an adequate showing that Maruyama discloses a printing press. For example, even

assuming that Maruyama prints an image on paper and moves the paper past "printing stations," Respondent has not demonstrated that merely printing images on paper or moving the paper past stations would have indicated a "printing press" to one of ordinary skill in the art. Indeed, Maruyama characterizes its system as simply "an image forming apparatus such as a copier or a laser printer" (col. **1,** 1. 9), which Respondent has not demonstrated to be the same as a "printing press" as would have been understood by one of ordinary skill in the art.

Independent claims 3, 5, and 7-12 recite a similar feature and the Examiner does not rely on any of Reynolds, Sainio, Dent, Seymour, Riepenhoff, or Admitted Prior Art to provide this feature.

(A008, Board Decision at 7, emphasis in original.)

### 1.    "Printing press" is a limiting element of claims 1-60, and the Board was correct to consider "printing press" in its obviousness determination

QIPC asserts that the Board erred because "printing press" should not be given any patentable weight.  (*See* Brief of Appellant ("QIPC Brief"), pp. 43-46.) QIPC asserts that "printing press" is not a claim limitation in claim 1 because it appears in the preamble.  (QIPC Brief, pp. 44-45.)

As a preliminary matter, "printing press" appears in the body of each of independent claims 3, 5, 7, 8, 10, 12, and 61.  The "printing press" feature is plainly a limitation of those claims and their respective dependent claims.  *See Catalina Mktg., Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 811 (Fed. Cir. 2002).

For independent claim 1,[1] the words "printing press" are not in the body of the claim, but they might as well be.  Claim 1 recites in the preamble "[a] visual inspection system configured to be in optical communication with a **substrate of a printing press**."  (*See* A844, Quad/Tech Board Appeal Brief at 47, emphasis added.)  The first element recited in the body of claim 1 is "a CMOS image recording device **configured to record images printed on <u>the</u> substrate**."  *Id.*  The reference to "substrate" in the body of the claim necessarily pulls in the "printing press" of the preamble – the antecedent basis for "substrate" specifies that it is the "substrate" of a "printing press."

In any event, even where an element is recited only in the preamble of a claim, it would still be limiting in the circumstances present here.  The determination of whether a preamble limits a claim is made on a case-by-case basis in light of the facts of each case.  *Catalina Mktg.* at 808.  If the claim preamble, when read in the context of the entire claim, recites limitations of the claim, then the claim preamble should be construed as if in the balance of the claim.  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999).  The effect preamble language should be given can be resolved only on review of the entirety

---

[1] While the discussion of the limiting nature of "printing press" is provided below with respect to independent claim 1, this discussion applies to independent claims 9 and 11 as well.

of the patent. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).

Here, the claim language manifests an intent to claim a visual inspection system configured *for* a printing press in claim 1. In *Pitney-Bowes*, the Court found the preamble statement that the patent claims an apparatus for "producing on a photoreceptor an image of generated shapes made up of spots" limiting in a claim in which the phrase provided antecedent basis for later recitations of the terms "generated shapes" and "spots" in the claim. 182 F.3d at 1305-06. The Court held that the phrase was not merely a statement describing the invention's intended field of use, but rather was "intimately meshed with the ensuing language of the claim." *Id.* at 1306. The Court determined that the terms "generated shapes" and "spots" could only be understood in the context of the preamble and found the preamble language to be limiting. *Id.*

Here, as in *Pitney-Bowes*, the substrate recited in the body of claim 1 draws antecedent basis from the preamble of claim 1 and can only be understood in the context of the preamble, which clarifies that that substrate is "a substrate of a printing press."

In addition to the claim language, the specification also compels the conclusion that "printing press" (that is, suitability for use in a printing press) is a limitation of the claims. In *Poly-America, LP v. GSE Lining Technology, Inc.*, the

Court assessed the validity of a patent directed to a landfill liner that included the

phrase "blown-film" in the preamble.  383 F.3d 1303, 1309-10 (Fed. Cir. 2004).

The Court held that the "blown-film" phrase was a limitation of the claims and that

the patent was valid over a prior art reference that did not teach a "blown-film"

filter.  *Id.* at 1310.  In so holding, the Court stated as follows:

> The specification is replete with references to the
> invention as a "blown-film" liner, including the title of
> the patent itself and the "Summary of the Invention." The
> phrase is used repeatedly to describe the preferred
> embodiments, and the entire preamble "blown-film
> textured liner" is restated in each of the patent's seven
> claims. Our analysis shows that the inventor considered
> that the "blown-film" preamble language represented an
> important characteristic of the claimed invention. We
> therefore agree with the district court's conclusion that a
> "[r]eview of the entirety of the '047 patent reveals that the
> preamble language relating to `blown-film' does not state
> a purpose or an intended use of the invention, but rather
> discloses a fundamental characteristic of the claimed
> invention that is properly construed as a limitation of the
> claim itself."

Here, as in *Poly-America*, the specification of the '423 patent is replete with

references to the invention as a visual inspection system for a "printing press."

The title, abstract, summary of the invention, and other portions of the

specification repeatedly state that the invention is used with a printing press.  (*See,*

*e.g.,* A021, '423 patent, title ("Method and Apparatus for Visually Inspecting a

Substrate of a Printing Press"), abstract ("The present invention relates generally to

the field of printing presses"), A026, '423 patent, summary of the invention, 1:7-8

("The present invention relates generally to the field of printing presses").)  The detailed description describes the various aspects of the invention in use on a web offset type of printing press, which is illustrated in Figure 1 of the '423 patent. (*See, e.g.,* A022, '423 patent, Fig. 1, A026, '423 patent, 2:60-67.)  Each of the independent claims of the '423 patent recites a printing press.  (*See* A030-31, '423 patent, claims.)  Similar to *Poly-America,* the entirety of the '423 patent consistently demonstrates that the inventor considered that the "printing press" preamble language represented an important characteristic of the claimed invention, and "printing press" is a limitation in claim 1.

The prosecution history also makes clear that the term "printing press" was considered an important limitation by both the Examiner and the Applicant.  The Examiner's search in the original examination was focused on references relating to the printing press art, as the primary reference cited by the Examiner, U.S. Patent No. 5,777,878 ("Helmrich"), relates to a screen printing press capable of adjusting a web to be printed.  (A1066, Office Action of February 27, 2004, at 3.) The Examiner indicated that the claims were allowable because the screen printing press reference Helmrich did not disclose the arrangement of LEDs in a circular configuration around the camera.  (A1068, Office Action of February 27, 2004, at 3.)  Further, the Applicant argued for patentability on the basis that the claimed

features would not have been obvious to use in a printing press.  In the Reply to the

Office Action of May 24, 2004, the Applicant stated:

> Persons skilled in the art of **printing press visual inspection systems** had long thought that the use of CMOS imaging devices was unsuitable for such systems, due to certain characteristics of CMOS devices.  In particular, the operation of CMOS devices includes inherent switching noise, and overcoming such noise was thought to be especially problematic in an application such as recording images printed on a **substrate in a printing press** … In other words, CMOS devices were thought not to be able to provide the necessary accuracy and flexibility required of a **web based** **visual inspection system**.
>
> …
>
> Further, Applicant disagrees with the assertion that high intensity LEDs in a **printing press** are equivalent to the light source disclosed in Helmrich.

(A1029, Reply to Office Action of May 24, 2004, emphasis added.)  These

arguments further indicate the intent on the part of the inventor to claim a printing

press visual inspection system.  *See Catalina Mktg., Int'l v. Coolsavings.com, Inc.*,

289 F.3d 801, 808-09 (Fed. Cir. 2002) ("[C]lear reliance on the preamble during

prosecution to distinguish the claimed invention from the prior art transforms the

preamble into a claim limitation because such reliance indicates use of the

preamble to define, in part, the claimed invention.").

The phrase "printing press" is also limiting because it limits the structure of

the recording device recited in the body of claim 1.  Terminology in the preamble

must be treated as a claim limitation when the terminology limits the structure of the claimed invention. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). There are differences between the structure of a recording device that is configured to record images "printed on the substrate [of a printing press]," and the structure of a recording device used to detect counterfeit bills in an ATM. For example, a recording device for a printing press must be capable of recording images from a substrate (e.g., paper) that is moving at speeds of several thousand feet per minute, much faster than a bill would move through an ATM. (*See* A028, '423 patent, 6:49-50, A878, Seymour Declaration at ¶ 11, A879, Seymour Declaration at ¶ 14.) The recording device of a printing press must also be capable of recording images having a very fine resolution to detect misalignment. (*See* A878-879, Seymour Declaration at ¶¶ 12-13.) As a result, the recording device of a printing press must be capable of capturing an image much more quickly than would be required of a recording device used for counterfeit detection in an ATM. (*See* A879, Seymour Declaration at ¶¶ 14-15.) These more stringent technical requirements on a recording device for a printing press necessitate that such a recording device have substantially higher imaging capabilities (e.g., resolution and imaging speed), and corresponding structure for providing such capabilities, than a recording device for an ATM. (*See* A878-879,

Seymour Declaration at ¶¶ 11-15.)  Thus, it is plain that "printing press" is

structural and not merely an intended purpose.

Against the repeated direct and indirect references to "printing press" and a

specification replete with references to "printing press[es]", QIPC argues that

"printing press" is not limiting because the prosecution history does not show that

printing press was given patentable weight.  (QIPC Brief, p. 45.)

QIPC's argument is wrong as a matter of fact.  As discussed above, the

primary reference cited against the claims was a screen printing press reference,

and allowance was based in part on the fact that the screen printing press reference

did not disclose a circular configuration of LEDs.  (A1066, Office Action of

February 27, 2004, at 3.)  The Examiner's focus on a printing press reference as

the primary reference indicates that the Examiner considered the "printing press"

recitation to be a factor in the patentability of claim 1.  The fact that the printing

press recited in the claims may be a conventional printing press is of little

consequence to whether a visual inspection system that is configured *for use with a*

*conventional printing press* and includes the recited illumination arrangements

would have been obvious.

In short, in the context of the claim language and patent specification, it is

plain that the claims are limited to systems for printing presses.  In response, QIPC

relies primarily on the prosecution history to the exclusion of the claim language

31

and the patent specification.  QIPC is wrong in its argument about the prosecution

history but, what is more, the Board decision establishes what the Patent Office

thinks and its decision is now a part of that history.  It is limiting.

> **2.     The Board correctly found that the combination of Ross and Maruyama does not disclose or suggest a "printing press"**

QIPC does not contest the Board's finding that Ross and Maruyama do not

disclose or suggest a printing press or systems suitable for use in one.  In fact,

QIPC appears to acknowledge that the combination of Ross and Maruyama fails to

disclose the "printing press" element.  (Brief of Appellant ("QIPC Brief"), p. 59.)

("That Ross and Maruyama did not disclose or describe a 'printing press' is

irrelevant.")  Instead, as discussed above, QIPC argues that "printing press" should

not be given any patentable weight.  (*See* QIPC Brief, pp. 43-46.)

Of course, QIPC could not credibly make such an argument.  Substantial

evidence supports the Board's conclusion that Maruyama does not disclose a

"printing press" as that term would have been understood by one of ordinary skill

in the art.  As the Board noted, "Maruyama characterizes its system as simply 'an

image forming apparatus such as a copier or a laser printer.'"  (*Id.*)  In its plain

usage, no typical person, much less one of ordinary skill in the printing press art,

would describe a copier or laser printer as a "printing press."

The '423 patent specification also supports the conclusion that the copier/laser printer of Maruyama is not a "printing press."  The '423 patent discusses a web offset press as being an example of a printing press.  (A026, '423 patent, 1:13-19.)  In such a web offset press, a "web," or roll of paper, may be fed from a reel stand to one or more printing units, each of which may print a different color ink.  (A026-027, '423 patent, 2:60 – 3:2.)  The printing press may run at rates of speed in excess of 3,500 feet per minute.  (A028, '423 patent at 5:26-30, 6:47-50.)  One of ordinary skill in the art would have understood that a typical copier or laser printer would not operate at speeds anywhere near those discussed in the '423 patent as being associated with a printing press.

Quad/Tech submitted a declaration from Quad/Tech Principal Engineer John Seymour further discussing the high speeds at which printing presses operate ("several thousand feet per minute") and the technical challenges associated with controlling a printing press operating at such high speeds.  (*See* A877-881, Seymour Declaration.)  The Seymour Declaration identified one application for which a printing press may be utilized as printing newsprint (e.g., newspapers).  (A880, Seymour Declaration at ¶ 16.)  One of ordinary skill in the art would have understood that newspapers are not printed on the copier/laser printer that is disclosed in Maruyama.

In view of the discussion of printing presses in the '423 patent and the Seymour Declaration, as well as the common knowledge and understanding of one of ordinary skill in the art of printing presses, substantial evidence exists to support the conclusion of the Board that the "image forming apparatus such as a copier or a laser printer" disclosed in Maruyama is not a printing press as would have been understood by one of ordinary skill in the art.  Accordingly, this determination upon which the Board's conclusion of nonobviousness was based should not be disturbed by the Court.

> **3.** **The Board correctly determined that claims 1-17 and 19-60 are nonobvious because the combination of Ross and Maruyama is entirely missing the "printing press" feature of claims 1-17 and 19-60**

QIPC improperly seeks to set up a straw-man by arguing that "[t]he Board, therefore, erred legally and factually when it determined that Maruyama and Ross were not analogous prior art merely because they were not within the field of a 'printing press.'"  (QIPC Brief, p. 46.)  While Ross is nonanalogous art for the reasons detailed below,[2] the Board's finding was not based on a determination that Maruyama and Ross are nonanalogous art.

The Board determined that Maruyama and Ross do not disclose a "printing press."  Accordingly, the combination of references is entirely missing an element

---

[2] *See infra* Section II.C.4.

of the claims.  *See CMFT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) ("[O]bviousness requires a suggestion of all limitations in a claim.") (citing *In re Royka*, 490 F.2d 981, 985 (CCPA 1974)).  The Board's conclusion of nonobviousness of claims 1-17 and 19-60 is proper as a matter of law.

Some of claims 1-17 and 19-60 (e.g., independent claims 5, 6, and 12) were rejected based on Ross and Maruyama in combination with one or more additional references, some of which disclose printing presses.  QIPC asserts that the addition of these references renders the relevant claims obvious.  (*See* QIPC Brief, pp. 59-64.)  As the Board noted, the Examiner did not rely on these references to teach the printing press feature of the claims.  (A008, Board Decision at 7.)  Even if these references were relied upon in the rejections as teaching the printing press feature of the claims, the claims would still be patentable over the combination of references for reasons discussed in detail below with respect to the rejections of claims 61-72 under 35 U.S.C. § 103(a).  *See infra* Section V.

**B.    Ross Does Not Disclose or Suggest an Illumination Arrangement Adapted to Illuminate the Substrate of the Printing Press, That Includes a Plurality of LEDs in a Circular Configuration[3]**

Ross also does not disclose, teach, or suggest an "illumination arrangement adapted to illuminate the substrate [of the printing press]" that includes "a plurality of high intensity LEDs arranged in a circular configuration surrounding the recording device" as recited in claim 11.  The Board stated in its decision, with respect to claim 61, that Ross discloses LEDs in a circular configuration.  (*See* A010-012, Board Decision at 9-11.)  The Board was wrong.

The specification of Ross makes plain that the ATM system is structured such that the four distinct illumination systems (pairs of LEDs) of Ross do not operate in a circular configuration, but rather operate as four separate and distinct illumination systems that are activated at different times.  As such, no singular circular arrangement ever illuminates the banknote at any point in time.  In fact, doing so would be inconsistent with Ross, and destroy the value of Ross, because only the two same color LEDs are supposed to operate at the same time.

---

[3] For the sake of clarity, the "circular configuration" illumination arrangement recited in claim 11 (as well as others of claims 1-60) will be used as a representative illumination arrangement for this discussion.  This discussion applies equally to other illumination arrangements configured to surround the imaging system (e.g., rectangular) recited in some of claims 1-60.

The system of Ross scans the banknotes as they travel through the ATM by illuminating the banknote with four separate pairs of diametrically opposed LEDs activated at different times to illuminate different parts of the banknote, with each pair of LEDs having a different color:

> A sensor head is provided, which includes a photo sensor and four paired LEDs, two each producing light of red, green, blue, and infra-red wavelengths. A banknote to be tested is located in the path of the sensor head, and a first pair of LEDs (for example, the red pair) is activated. A spot on the banknote is illuminated, and the intensity of diffusely reflected red light is detected by the photo sensor, and recorded in a computer processor memory. The note is then moved forward a short distance, and the second pair of LEDs is activated. This is repeated until the whole length of the banknote has been illuminated. Each illumination is performed after the note has moved through a specified distance; and the duration of each illumination is controlled by a timer incorporated in the system.

(A184, Ross, 5:13-17, 6:35-49.)

While Figure 1a of Ross may appear to show multiple LEDs disposed around a sensor, the specification of Ross makes plain that the system is structured so that the LEDs never illuminate in a circular configuration at any time or at any position of the banknote.  The sensor head illustrated in Figure 1a of Ross only activates a single pair of LEDs of one particular color at a time.  (*See* A184, Ross, 5:13-17, 6:35-49, A185, Ross, 7:62 – 8:3.)  The sensor head may conduct one example lighting sequence as follows, according to the teachings of Ross.  (*See id.*)

A banknote may be moved in front of the sensor head, and a red pair of LEDs may be activated for a fixed time period:



PULSE 1: RED

The red LED pair may be deactivated, and the banknote may be moved forward a short distance. A separate green pair of LEDs may then be activated and then deactivated after a short period of time. The banknote may again be advanced forward, and a blue pair of LEDs may then be activated. Finally, the blue LED pair may be deactivated, the banknote may be advanced forward again, and an infra-red pair of LEDs may be activated.

The detector collects sample data when each LED pair is illuminated, resulting in a sample data train containing information on the response of the banknote to all four wavelengths of light across different areas of the banknote. (A185, Ross, 8:4-19.) The multiple-wavelength sample data is compared against

reference data for a genuine banknote corresponding to multiple wavelengths to determine whether the scanned banknote is genuine.  (A183, Ross, 3:8-9, 3:46-57.)

The example sequence illustrated above demonstrates that at no point in time, and at no area on the banknote, are the LEDs of Ross ever illuminated in a circular configuration.  Instead: (1) a first area of the banknote is illuminated with a first color pair of LEDs at a first point in time; (2) a second area of the banknote is illuminated with a second color pair of LEDs at a second point in time; (3) a third area of the banknote is illuminated with a third color pair of LEDs at a third point in time; and (4) a fourth area of the banknote is illuminated with a fourth color pair of LEDs at a fourth point in time.

In determining that Ross shows a circular configuration of LEDs, the Board stated that "[w]e find no significant difference between a group of devices for serving a common purpose (i.e., a 'system' as would have been understood by one of ordinary skill in the art) and Ross' group of LEDs (or 'devices') for serving the common purpose of illuminating an object."  (A013, Board Decision at 12.)

This reasoning is legal error.  The claims recite circular illumination systems, but Ross is structurally incapable of circular illumination.  There is no factual question about the disclosure of Ross.  The purpose of the separate, distinct pairs of LEDs in Ross is to allow the sensor head to collect data corresponding to distinct different wavelengths of light that "may be used for more rigorous analysis

of the sample than that provided by data obtained from light of a single wavelength." (A183, Ross, 3:12-14.) To this end, Ross consistently and repeatedly states that only a single pair of diametrically opposed LEDs is activated at a time as the banknote is moved through the ATM to allow the sample data at the different wavelengths to be collected. (*See, e.g.,* A183, Ross, 3:21-22, 4:55-59, A184, Ross, 5:13-17, 6:38-45, A185, Ross, 7:62-65, A186, Ross, 10:62-65.)

In short, the specification of Ross makes manifest that the LEDs of Ross never illuminate a banknote in a circular configuration and therefore do not disclose a circular illumination unit. The claims require a circular illumination unit and the ATM unit of Ross simply do not disclose a system that does that. Ross discloses a system that illuminates in pairs sequentially over time.

## C. Ross and Maruyama Cannot Be Combined As Proposed in the Rejections

The combination of Ross and Maruyama proposed in the rejections also is improper for several different reasons. Ross and Maruyama disclose different types of systems <u>with incompatible principles of operation</u>. *See infra* Section II.C.1. Modifying the LEDs of Ross to operate in a circular configuration would render them unsuitable for their intended purpose. *See infra* Section II.C.3. Ross is also nonanalogous art because one of ordinary skill in the art of printing press control would not have looked to the ATM banknote scanner of Ross to improve a visual inspection system of a printing press in view of the unique technical

challenges in printing press control and the very different problem addressed by

Ross.  *See infra* Section II.C.4.  In light of these considerations, it would not have

been obvious for one of ordinary skill in the printing press control art to combine

Ross and Maruyama to arrive at the features recited in claims 1-17 and 19-60 as

proposed in the rejections.  Additionally, QIPC's publications praise the circular

configuration of LEDs found in its own product and provide strong objective

evidence of nonobviousness.  *See infra* Section II.C.5.

### 1.    Ross and Maruyama disclose systems with incompatible principles of operation, and Ross teaches away from the principle of operation illustrated in Maruyama

Two references cannot be properly combined if the proposed combination or

modification would require a change in the principle operation of one of the

references.  *See In re Ratti*, 270 F.2d 810, 813 (CCPA 1959).  Here, the proposed

combination of Ross and Maruyama would require a change in the diffuse

reflection principle that Ross requires verifying whether banknotes are genuine

with the direct illumination required for Maruyama.  As a result, Ross and

Maruyama cannot be properly combined.

Ross teaches that its detector is positioned to receive only diffusely reflected

light from the four different illumination systems (pairs of LEDs).  (*See, e.g.,*

A178, Ross, abstract, A182, Ross, 1:51-54, 2:19-22, 54-57, A183, Ross, 4:23-36,

A184, Ross, 5:6-8, 6:1-3, A186, Ross, 10:16-21.)  The diffusely reflected light is

used to generate sample data that is based on the response of the banknote to light of different wavelengths.  (A183, Ross, 3:10-14.)  Ross states that "[i]t is desirable that the detector not receive light directly reflected from the media or transmitted directly from the light source to the detector, as such light does not contain any spectral information regarding the media to be detected."  (A183, Ross, 4:30-33.)

This direct reflection that Ross teaches away from using is precisely the type of reflection used in the system of Maruyama.  Maruyama teaches a system in which light from an LED is applied obliquely the surface of the recording sheet, and reflected light from the recording sheet is imaged on a CMOS sensor.  (A197, Maruyama, 4:30-42.)  Maruyama illustrates this system and its functionality in Figure 2:



(A191, Maruyama, Fig. 2.)  Figure 2 of Maruyama shows the LED positioned to a side of the sensor and appears to illustrate light from the LED being reflected directly from the recording sheet into the sensor.  If the LED of Maruyama were replaced with the multiple pairs of LEDs of Ross according to the proposed

combination, it would require a change in the diffuse reflection principle of operation that Ross repeatedly emphasizes in its disclosure.

To combine them in this manner, therefore, constitutes legal error. Prior art references must be considered in their entirety (i.e., as a whole), including portions that would lead away from the claimed invention. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983). In *In re Ratti*, the claims were directed to an oil seal with a bore engaging portion including resilient spring fingers inserted in a resilient sealing member. 270 F.2d 810, 811 (CCPA 1959). The primary reference in the combination of references used to reject the claims disclosed an oil seal with a bore engaging portion that was reinforced by a cylindrical sheet metal casing. *Id.* at 811-12. The oil seal of the primary reference required rigidity for operation, while the claimed invention required resiliency. *Id.* The Court reversed the rejection, holding that "[t]he suggested combination of references would require substantial reconstruction and redesign of the elements shown in Chinnery et al. as well as a change in the basic principles under which the Chinnery et al. construction was designed to operate." *Id.* at 813.

Here, as in *Ratti*, the suggested combination of Maruyama and Ross would require a change in the basic diffuse reflection principle under which the sensor head of Ross was designed to operate. Therefore, the combination of Maruyama and Ross constitutes legal error.

To be blunt, the combination requires use of hindsight in its rawest and most legally incorrect form. No person of ordinary skill in the art would combine the ATM counterfeit detector with the Maruyama photocopier. The only reason to do so would be an effort to invalidate the claims in the present printing press application – impermissible hindsight.

> **2.    Even if Ross and Maruyama were combined, one of ordinary skill in the art would not have modified Maruyama to place the LEDs around the sensor**

Assuming, *arguendo*, that the combination of Ross and Maruyama was not rendered improper by their incompatible principles of operation, QIPC has not identified any reason why one of ordinary skill in the art would have modified Maruyama to place the LEDs around the sensor. Maruyama teaches a single LED disposed to the side of the sensor and configured to directly reflect light off the recording sheet and into the sensor. (*See* A191, Maruyama, Fig. 2.) Even if Ross and Maruyama could be combined, one of ordinary skill in the art would have simply replaced the single LED of Maruyama with the multiple LED pairs of Ross, such that all of the LEDs were disposed to the side of the sensor (i.e., in the position of the LED shown in Figure 2 of Maruyama, reproduced above) and configured to directly reflect light off the recording sheet into the sensor. The QIPC Brief does not identify any reason or motivation that would have caused one

of ordinary skill in the art to further modify Maruyama to place the LEDs around the sensor rather than to the side of the sensor as is taught by Maruyama.

### 3.    Modifying Ross to activate the pairs of LEDs together at the same time in a circular configuration would render the sensor head of Ross unsatisfactory for its intended purpose

There is no suggestion or motivation to make a proposed modification if the modification would render the invention unsatisfactory for its intended purpose. *See In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1994). Ross and Maruyama cannot be combined in the manner proposed in the rejections because modifying Ross to activate the four separate and distinct illumination systems (pairs of LEDs) together in a circular configuration, rather than separately activating each illumination system, would render Ross unable to collect the data at different wavelengths that is used to verify whether a banknote is genuine.

Both QIPC and the Board oversimplify the purpose of Ross in a way that entirely ignores the ultimate goal of its banknote scanning system. The Board characterizes the intended purpose of Ross as "illuminating an object," while QIPC characterizes the purpose as being "to illuminate and gather data in printed images from moving paper." (A013, Board Decision at 12, QIPC Brief at 17.)

The stated intended purpose of Ross is to determine whether banknotes are genuine and to detect forgeries. (A182, Ross, 1:9-12, A183, Ross, 3:8-14.) The system of Ross accomplishes this intended purpose by separately illuminating pairs

of LEDs, each having a different color, at different positions along a banknote to collect sample data corresponding to different wavelengths of light, which purportedly allows the system of Ross to more rigorously analyze the banknote than if only light of a single wavelength were used. (*See, e.g.,* A183, Ross, 3:8-14, 3:46-57, A184, Ross, 5:13-17, 6:35-49.)

If the system of Ross were modified to activate the LED pairs together at the same time and operate the LEDs in a circular configuration, it would no longer be capable of performing its intended purpose of detecting whether banknotes traveling through the ATM are genuine, according to the express teaching of the reference itself. The four pairs of LEDs would simultaneously illuminate the banknote with all four separate wavelengths of light. Any resultant data collected by the sensor head of Ross would be based on a blend of all of the different wavelengths. The system of Ross would no longer be able to collect sample data corresponding to several separate wavelengths of light for use in comparing to a reference dataset to verify whether a banknote is genuine.

In *In re Gordon*, the Court held that the examiner had failed to establish a *prima facie* case of obviousness where the rejection proposed a modification that would render the prior art reference inoperable for its intended purpose. 733 F.2d 900, 902 (Fed. Cir. 1994). The claimed device was a blood filter assembly having both an inlet and an outlet located near a bottom end of the assembly and a gas

vent near the top of the assembly. *Id.* at 901. The claims were rejected based on a prior patent that taught a liquid strainer for removing dirt and water from gasoline. *Id.* The liquid strainer included an inlet and outlet at a top end of the strainer and a pet-cock at the bottom of the strainer used to remove the dirt and water. *Id.* at 902. Gravity was used to assist in separating heavier oils and water. *Id.* The Board affirmed the rejections, reasoning that it would have been obvious to turn the prior art strainer upside-down to have the inlet and outlet at the bottom and use the pet-cock as the claimed gas vent. *Id.*

The Court reversed, stating that "[t]he mere fact that the prior art could be so modified would not have made the modification obvious unless the prior art suggested the desirability of the modification." *Id.* The Court found that turning the prior art strainer upside-down would render it inoperable for its intended purpose because the gasoline would be trapped at the top, the water the strainer was intended to separate would flow freely out of the bottom of the upside-down strainer through the outlet, and unwanted dirt would build up and clog the screen of the filter. *Id.* Accordingly, the Court stated that "[i]n effect, [the prior art reference] teaches away from the board's proposed modification." *Id.*

Here, as in *Gordon*, modifying the sensor head of Ross to activate the pairs of LEDs together, at the same time, in a circular configuration would render Ross inoperable for its intended purpose of verifying whether banknotes are genuine

using sample data based on multiple wavelengths of light.  Accordingly,

combining Maruyama and Ross and modifying Ross in this manner constitutes

legal error.

### 4.    Ross is not analogous art to the claimed invention

In order for a reference to be relied upon for an obviousness rejection, it

must be analogous art to the claimed invention.  *In re Bigio*, 381 F.3d 1320, 1325

(Fed. Cir. 2004).  A reference is analogous art to the claimed invention if: (1) the

reference is from the same field of endeavor as the claimed invention; or (2) the

reference is reasonably pertinent to the problem being solved.  *Id.*  In order for the

reference to be reasonably pertinent, it must "logically … have commended itself

to an inventor's attention in considering his problem."  *In re Icon Health and

Fitness, Inc.*, 496 F.3d 1374, 1379-80 (Fed. Cir. 2007) (quoting *In re Clay*, 966

F.2d 656, 658 (Fed. Cir. 1992)).

Plainly Ross is not from the same field of endeavor.  The present patent

concerns systems for printing presses, which have difficult requirements in every

way.  Internal counterfeit detection in an ATM, which has utterly different

requirements, could not be further away.

For the same reason, therefore, an internal counterfeit detection system in an

ATM (Ross) would not have logically commended itself to an inventor's attention

for a visual inspection system of a printing press.  Printing press inspection

involves significant technical challenges, such as very high speeds and tight alignment of colors necessary for commercial success, that are not present in the ATM banknote scanning environment of Ross. (*See* A877-881, Seymour Declaration.) The object of a printing press is to print a large number of copies with high quality in as short a period of time as possible. To accomplish high throughput, printing presses are designed to move paper through the press at several thousand feet per second. (*See* A028, '423 patent, 6:49-50, A879, Seymour Declaration at ¶ 14.) The stresses and dynamics involved with moving the paper at a high rate of speed causes movement of the paper relative to the surface applying the ink. (A878, Seymour Declaration at ¶ 12.) Because separate surfaces apply separate colors of ink, misalignment of the paper can cause misalignment between colors of ink in the printed image. (*Id.*) Even a very slight misalignment of two layers of differently colored ink (e.g., on the order of 0.001 inch) can be visible to the human eye and commercially unacceptable. (*Id.*)

To measure misalignments on the order of 0.001 inch, the resolution of an image captured by a visual inspection system must be on the order of 0.001 inch. (A879, Seymour Declaration at ¶ 13.) At a speed of approximately 3,000 feet per minute and a 0.001 inch resolution, the visual inspection system has no more than 1.7 microseconds to capture each image. (A879, Seymour Declaration at ¶¶ 13-14.)

ATM's do not move banknotes at speeds anywhere near the operating speed of a printing press.  (A878, Seymour Declaration at ¶ 11.)  The imaging time for the ATM verification system is an order of magnitude (or more) slower than that of a printing press.  (*Id.*)  Therefore, the ATM verification system will require much less illumination because it will have significantly more time to capture the data.  (A879, Seymour Declaration at ¶ 15.)  A person of ordinary skill in the printing press art would not logically look to Ross because the illumination features of an ATM banknote scanner would be highly unlikely to satisfy the technical requirements of printing press inspection.

Ross also would not have commended itself to an inventor's attention because the problem addressed by Ross is very different from the problems addressed by the '423 patent.  In *In re Klein*, the Court rejected a determination of the Board that five references were analogous art to a claimed nectar feeder with movable dividers for preparing different ratios of sugar and water.  647 F.3d 1343, 1345-46 (Fed. Cir. 2011).  The Court found three of the references to be nonanalogous based on their purpose of separating solid objects, noting as follows:

> An inventor considering the problem of "making a nectar feeder with a movable divider to prepare different ratios of sugar and water for different animals," would not have been motivated to consider any of these references when making his invention, particularly since none of these three references shows a partitioned container that is adapted to receive water or contain it long enough to be able to prepare different ratios in the different

> compartments. *See Clay,* 966 F.2d at 659 ('If [a
> reference] is directed to a different purpose, the inventor
> would accordingly have had less motivation or occasion
> to consider it.').

*Id.* at 1350-51 (quoting *In re Clay* 966 F.2d 656, 659 (Fed. Cir. 1992)).  The Court

held that the other two references were also nonanalogous art because neither

showed a movable divider or the ability to prepare different ratios.  *Id.* at 1352.

Thus, the Court held that the Board's determination that the references were

analogous art was not supported by substantial evidence, and the Court reversed

the rejections.  *Id.*

Similar to *Klein*, the Ross reference addresses an entirely different problem

in an entirely different way than the '423 patent and is therefore nonanalogous art.

QIPC attempts to cast the problems solved by Ross and the '423 patent as the same

broad problem: "how to illuminate and observe images printed on moving paper

more accurately and efficiently using LEDs."  (QIPC Brief at 41.)  This

oversimplification of the problem addressed by Ross ignores Ross' stated purpose

of determining whether banknotes are genuine and detecting forgeries.  (A182,

Ross, 1:9-12, A183, Ross, 3:8-14.)  The multiple segregated pairs of LEDs in Ross

are designed to address this banknote verification problem by providing data at

different wavelengths, directed to different place on the bank note, and are not

directed to improving illumination of the banknotes.

QIPC and the Board improperly ignored or misapplied the Seymour Declaration evidence to build its obvious arguments. QIPC asserts that the high amount of illumination required would have motivated a person of ordinary skill in the art to look to Ross, and that the Seymour Declaration submitted by Quad/Tech allegedly provides evidence of obviousness. (QIPC Brief at 55-57.) The Board also cited the Seymour Declaration as allegedly supporting its determination of the obviousness (see portion of decision affirming rejections of claims 61-72 over the combination of Ross and Sainio). (A010-A012, Board Decision at 9-11.) As the Seymour Declaration described, even if the desire for a high amount of illumination would have motivated a person of ordinary skill in the art to look for ways to increase illumination in analogous art (e.g., printing press references), it would have dissuaded him or her from looking to Ross in light of the much lower illumination requirements in an ATM scanning system and very low probability that an ATM scanning reference would yield solutions appropriate for use with a printing press. (*See* A879, Seymour Declaration at ¶ 15.) There is no evidence to the contrary that was ever submitted by QIPC, the Examiner or the Board.

QIPC and the Board also improperly used the '423 patent to apply hindsight in their analysis. The Board, again with reference to the rejections of claims 61-72, also stated that "Mr. John Seymour further states that one of ordinary skill in the art would have also desired 'multidirectional lighting' in order to overcome

problems associated with certain color inks being 'difficult to recognize.'" (A011, Board Decision at 10, citing Seymour Declaration at ¶¶ 16-17. *See also* QIPC Brief at 55-56.) The cited portions of the Seymour Declaration describe benefits that were found by the inventor of the '423 patent to stem from the multidirectional illumination provided by his inventive illumination arrangement. The Seymour Declaration does not state or suggest that one of ordinary skill in the printing press control art at the time of invention would have known of the benefits of multidirectional illumination in printing press control or would have desired or sought out multidirectional lighting solutions. The interpretation of the Seymour Declaration adopted by the Board and QIPC is based on the improper application of hindsight in light of the teachings of the '423 patent disclosure. *See In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

Further, even if one of ordinary skill in the art would have desired multidirectional lighting, he or she would not have looked to Ross, as Ross does not teach multidirectional lighting. Ross teaches activating only a single pair of LEDs at a particular time, and, accordingly, Ross teaches lighting only along a single plane, not multidirectional (e.g., circular) lighting. (*See* A184, Ross, 5:13-17.)

QIPC also states that "a search on the USPTO website produces Ross when using the terms 'light sources,' 'light detector,' 'processor,' 'printing,' 'rollers,'

'high speeds,' and 'LED.'" (QIPC Brief at 28.) The fact that QIPC has used hindsight to hand-select particular terms from Ross says nothing about the likelihood that a person of ordinary skill in the art would have sought out Ross in view of the different technical challenges and different problems discussed above. A person of ordinary skill in the art would not simply disregard these significant distinctions because Ross happens to share some general terms in common with the '423 patent.

### 5.    QIPC's own publications provide strong objective evidence of nonobviousness

QIPC's own laudatory statements regarding the circular arrangement of LEDs surrounding a recording device in its own product provide objective evidence of nonobviousness. One form of judicially accepted objective evidence is praise of the invention by others in the same industry. *See, e.g., Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1092 (Fed. Cir. 1987). In particular, statements by another party praising its infringing product as an advancement in the industry are reliable secondary evidence of nonobviousness. *See, e.g., Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010). In *Power-One*, Artesyn launched its own infringing product in response to Power-One's invention and touted it is "enab[ling] the customer to communicate, configure and monitor a variety of different converter functions which in the past was just not an option or required separate and specialized silicon to be achieved." *Id.* The Court

held that "Artesyn's position that Power-One's invention was obvious is inconsistent with its position that its own infringing product was an advancement in the industry." *Id.* Accordingly, the Court found Artesyn's statements touting its infringing product to support the jury's conclusion that Power-One's patent was not invalid. *Id.*

Nearly six years after the application leading to the '423 patent was filed, QIPC itself publicly praised the innovation embodied in the claims. In 2008, QIPC published its newsletter "Register Focus," in which it introduced its "new generation IRS camera" for press control. (A860-872, QIPC "Register Focus.") In this newsletter, QIPC stated that the camera uses:

> <u>very different lighting technology</u> to illuminate the web. Rather than using halogen lighting we are now using <u>state-of-the-art LED lighting technology</u>, which is neatly incorporated in a <u>ring around the optical CCD sensor.</u>

(A863, QIPC "Register Focus" at 3, middle column, emphasis added.) QIPC believed the technology represented a "radical innovation":

> The Moment registerFOCUS starts discussing the drupa launch of the <u>m</u>RC – Q.I. Press Controls' new generation IRS camera – with key people at Q.I. Press Controls, we can't help but get the feeling that we are witnessing the birth of a <u>radical innovation</u>.

(*Id.*, left column, emphasis added.) QIPC described the "ring of LED lighting" used in its product as one of the two "most striking design features of the mRC camera":

> The <u>ring of LED lighting</u> and the compact design are the <u>most striking design features</u> of the mRC camera, which contains new optical chip technology.

(*Id.*, bottom of page, emphasis added.)  In another brochure on QIPC's Markless Register Control system, QIPC again praised its "[i]nnovative optical technology using LED lighting."  (A875, QIPC "Markless Register Control" at 2.)

Here, as in *Power-One*, the evidence provided by the QIPC publications is highly credible.  Over 6 years after the invention of the '423 patent was made; QIPC publicly praised and touted the "ring of LED lighting" featured in its product.  As in *Power-One*, QIPC's position that the illumination arrangements embodied in the claims of the '423 patent were obvious is inconsistent with its position that its own product featuring a ring of LEDs was a "radical innovation."

The Board erred by disregarding this evidence on the basis that the nexus between the claim language and the features praised by QIPC was allegedly not established.  (A015, Board Decision at 14.)  However, the Board acknowledged only certain passages of the QIPC publications in its decision and completely ignored those passages that directly praise the ring of LEDs in the QIPC product. (*See* A014-015, Board Decision at 13-14.)  QIPC stated that its camera utilizes "very different lighting technology" including "state-of-the-art LED lighting technology, which is neatly incorporated in a <u>ring around the optical CCD sensor</u>." (A863, QIPC "Register Focus" at 3, middle column, emphasis added.)  QIPC

further stated that "[t]he <u>ring of LED lighting</u> and the compact design are the <u>most striking design features</u> of the mRC camera." (*Id.*, bottom of page, emphasis added.)

These passages establish an unambiguous and direct nexus between QIPC's praise of its product and the claimed illumination arrangements of the '423 patent. The Court has held that disregarding objective evidence of nonobviousness constitutes legal error. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1547 (Fed. Cir. 1983). The Court in *W.L. Gore & Associates* stated that "the district court did not discuss the strong showing of objective evidence of nonobviousness here present … [t]hat approach was error." *Id.* at 1555. Here, while the Board addressed QIPC's statements, it completely ignored those statements that were most pertinent and had the most direct nexus to the illumination arrangements recited in the claims of the '423 patent. Accordingly, as in *W.L. Gore & Associates*, the Board here committed legal error by wholly disregarding this strong objective evidence when coming to its conclusion of obviousness with respect to claims 61-72.

## III.   THE BOARD CORRECTLY REVERSED THE REJECTIONS OF CLAIMS 14 AND 24 UNDER 35 U.S.C. § 112

The Board correctly held that claims 14 and 24 comply with the written description requirement and reversed the rejections of those claims under 35 U.S.C. § 112, first paragraph. (A006, Board Decision at 5.) Claims 14 and 24

recite that "the LEDs are disposed between the sensor and the substrate of the

printing press." As the Board correctly noted, this feature is shown in at least

Figures 2 and 3 of the '423 patent disclosure. Figure 2 (reproduced below with a

dashed oval overlaid for emphasis) illustrates a camera assembly 50 that includes

an image recording device 64 and an illumination system 66:



(A023, '423 patent, Fig. 2, emphasis added.) Figure 2 shows the illumination

system 66 (e.g., LEDs) being disposed between the image recording device 64

(e.g., sensor) and the substrate 12. Additionally, Figure 3 (reproduced below with

a dashed oval overlaid for emphasis) illustrates an image recording device 64 and

LEDs 67 located around a lens associated with the image recording device:



(A022, '423 patent, Fig. 3, emphasis added, A027, '423 patent, 4:47-65.)  A person of ordinary skill in the art would understand that the lens would be pointed at the substrate and that the sensor, although not shown in Figure 3, would be positioned in front of the lens within the housing of the image recording device, such that the LEDs would be between the sensor and the substrate, as properly acknowledged by the Board.  (A006, Board Decision at 5.)

The Board's conclusion that claims 14 and 24 are supported by Figures 2 and 3 and the associated disclosure of the '423 patent is supported by substantial evidence and should be affirmed.

## IV.  CLAIMS 13-60 ADDED DURING REEXAMINATION DID NOT ENLARGE THE SCOPE OF THE PATENT

QIPC also argues that the Board erred by reversing the rejections of claims 13-60 because the addition of those claims allegedly improperly expanded the scope of the '423 patent in violation of 35 U.S.C. § 305.  (QIPC Brief, pp. 66-67.) QIPC did not present this argument before the Board and, accordingly, has waived

its right to do so before this Court.  *See In re Baxter Int'l, Inc.*, 687 F.3d 1357, 1362 (Fed. Cir. 2012) (citing *In re Watts*, 354 F.3d 1362, 1367-68 (Fed. Cir. 2004)) ("Absent exceptional circumstances … we generally do not consider arguments that the applicant failed to present to the Board.").

Even if QIPC's arguments are not waived, added claims 13-60 did not enlarge the scope of any claim of the '423 patent.  Each of claims 13-60 is a dependent claim that ultimately depends from independent claim 11, which remains in its original form as it issued in the '423 patent.  Each of dependent claims 13-60 by definition incorporates all of the limitations of claim 11.  *See* 35 U.S.C. § 112, ¶ 4 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").  Accordingly, since every one of claims 13-60 depends from independent claim 11 and incorporates all of the limitations of that claim, the addition of claims 13-60 during reexamination could not have enlarged the scope of the '423 patent.  QIPC does not provide any explanation as to why the added claims allegedly enlarged the scope of the '423 patent, and its reply brief is too late to provide such explanation for the first time.  *See Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

## V.    THE BOARD ERRED BY AFFIRMING THE REJECTIONS OF CLAIMS 61-72 UNDER 35 U.S.C. § 103

Claims 61-72 were rejected under 35 U.S.C. § 103 based on a combination of Ross and Sainio.  (*See* A009, Board Decision at 8.)  The Board held that Sainio discloses a printing press, that Ross discloses LEDs in a circular configuration, and that the combination of Sainio and Ross would have been obvious to one of ordinary skill in the art.  (*See* A009-010, Board Decision at 8-9.)

The Board's finding of obviousness is legally erroneous and is not supported by the evidence, and the Board's holding affirming the rejections of claims 61-72 under 35 U.S.C. § 103 should be reversed.  Despite the fact that Sainio discloses a printing press, claims 61-72 are still patentable over the combination of Sainio and Ross, alone or in combination with Dent and/or the background of the '423 patent, for many of the same reasons that claims 1-60 are patentable over the combination of Ross and Maruyama.

### A.    Ross Does Not Disclose or Suggest the Illumination System Recited in Claim 61

As stated many times before, Ross does not disclose, teach, or suggest "an illumination system comprising a plurality of LEDs that are disposed in a configuration surrounding the optical communication path between the substrate and the image recording device, wherein the illumination system is adapted to illuminate the substrate of the printing press," as recited in independent claim 61.

61

Ross fails to disclose this surrounding LED configuration for the reasons discussed in detail above in Section II.B.  The system of Ross scans banknotes as they travel through an ATM by illuminating the banknote with four separate systems made up of pairs of LEDs activated at different times, over different areas of the banknote, with each system (pair of LEDs) having a different color.  (A184, Ross, 5:13-17 and 6:35-49.)  For the reasons discussed in detail in Section II.B, the LEDs of Ross are never, at any point in time or at any area on the banknote, illuminated in a surrounding LED configuration such as the configuration recited in claim 61.

Sainio provides no teaching or suggestion to cure this deficiency of Ross.  Accordingly, the combination of Sainio and Ross is also missing the illumination arrangement recited in claim 61.

### B.    Ross and Sainio Cannot Be Combined As Proposed in the Rejections

Ross and Sainio also cannot be properly combined for many of the same reasons that the proposed combination of Ross and Maruyama with respect to claims 1-60 is improper.  For example, the proposed combination of Ross and Sainio would still require Ross to be modified in a manner that would render Ross unsatisfactory for its intended purpose.  *See supra* Section II.C.3.  The substitution of Sainio for Maruyama does not change the fact that, in order to achieve the illumination system with the surrounding configuration arrangement recited in claim 61, Ross would still need to be modified to activate its LED pairs together

rather than separately as is consistently taught throughout Ross. (*See, e.g.,* A184, Ross, 5:13-17 and 6:35-49.) Modifying Ross to activate its LED pairs together in a surrounding configuration would still render Ross inoperable for its intended purpose of verifying whether banknotes are genuine using sample data based on multiple wavelengths of light for the reasons discussed in detail in Section II.C.3.

Ross is also not analogous art to either the claimed invention or the system of Sainio. *See supra* Section II.C.4. Ross would not have logically commended itself to an inventor's attention in considering ways to improve the lamp disclosed in Sainio in view of the technical challenges (e.g., high speeds and tight ink alignment requirements) in printing press control that are not present in the ATM environment. (A878, Seymour Declaration at ¶¶ 11-12.) A person of ordinary skill in the printing press art also would not have looked to Ross in view of Ross' very different intended purpose of determining whether banknotes are genuine. The Seymour Declaration provides objective factual evidence of nonobviousness and does not provide evidence of obviousness as asserted by the Board for the reasons discussed in detail in Section II.C.4.

Further, the laudatory statements in QIPC's publications also provide objective evidence of nonobviousness of the surrounding LED configuration recited in claim 61. *See supra* Section II.C.5. These statements praise various aspects of QIPC's camera product, including the "ring of LED lighting" featured in

the product.  *See id.*  These passages establish an unambiguous and direct nexus between QIPC's praise of its product and the surrounding illumination arrangement recited in claim 61, and disregarding this strong objective evidence when determining claims 61-72 to be obvious constituted legal error on the part of the Board.

## VI.    THE BOARD ERRED BY AFFIRMING THE REJECTION OF CLAIM 18 UNDER 35 U.S.C. § 112

The Board also erred by affirming the rejection of claim 18 under 35 U.S.C. § 112.  Claim 18 recites that "the substrate of the press is unsupported at the point where the substrate is configured to be illuminated by the illumination arrangement."  Figure 1 of the '423 patent illustrates a representative printing press having a number of areas where the web (12) is unsupported, such as the portion highlighted below with the dashed oval:



(A022, '423 patent, Fig. 1, emphasis added.)  Figure 2 illustrates a visual inspection system having an illumination system:



(A023, '423 patent, Fig. 2, emphasis added.)  Figure 2 illustrates that the portion of

the substrate 12 where the substrate is configured to be illuminated by illumination

system 66 is unsupported by rollers or any other structural elements.  One of

ordinary skill in the art would understand that the illustrated portion of substrate 12

shown in Figure 2 that is configured to be illuminated by illumination system 66

may be a portion of substrate 12 illustrated as being unsupported in Figure 1.  The

features of claim 18 are provided by at least Figures 1 and 2, and the portion of the

Board's decision affirming the rejection of claim 18 under 35 U.S.C. § 112 should

be reversed.  Further, claim 18 is allowable over the combination of Maruyama and

Ross for the same reasons discussed above in Section II, and the rejection of claim

18 under 35 U.S.C. § 112 should also be reversed.

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For the foregoing reasons, Cross-Appellant Quad/Tech, Inc. respectfully requests that this Court affirm the portion of the Board Decision on Appeal reversing the rejections of claims 1-17 and 19-60 and reverse the portion of the Board Decision on Appeal affirming the rejections of claims 18 and 61-72.

Dated: May 13, 2013                              Respectfully submitted,

                                                 /s/ Matthew B. Lowrie
                                                 Matthew B. Lowrie
                                                 FOLEY & LARDNER LLP
                                                 111 Huntington Avenue
                                                 Boston, MA 02199
                                                 (617) 342-4000

                                                 Brett P. Belden
                                                 FOLEY & LARDNER LLP
                                                 777 East Wisconsin Avenue
                                                 Milwaukee, WI 53202-5306
                                                 (414) 271-2400

# United States Court of Appeals
# for the Federal Circuit
*Q. I. PRESS CONTROLS v REA,* 2012-1630, -1631

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by FOLEY & LARDNER LLP, Attorneys for Cross-Appellant to print this document.  I am an employee of Counsel Press.

On **May 13, 2013**, Counsel for Cross-Appellant has authorized me to electronically file the foregoing **Brief for Cross-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

David D. Langfitt
dlangfitt@lockslaw.com
LOCKS LAW FIRM
601 Walnut Street
Philadelphia, PA 19106
215-893-3423
*Counsel for Q.I. Press Controls, B.V.*

Raymond T. Chen, Solicitor
tasha.gibbs@uspto.gov
Sydney O. Johnson Jr.
sydney.johnson@uspto.gov
Joseph G. Piccolo
joseph.piccolo@uspto.gov
U.S. Patent and Trademark Office
Office of the Solicitor
MDW 8A15
P.O. Box 1450
Mail Stop 8
Alexandria, VA 22213-1450
( 571) 272-9035
*Counsel for Teresa Stanek Rea,*
*Acting Director, USPTO*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court, via Federal Express, within the time provided in the

Court's rules.

May 13, 2013                                                    /s/ John C. Kruesi, Jr.
                                                               COUNSEL PRESS

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS</u>

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2).

____X____ The brief contains <u>14,785</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

____X____ The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2002 </u>in a <u>14</u>point <u> Times New Roman </u>font or

_____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

<u>/s/ Matthew B. Lowrie        </u>
Matthew B. Lowrie
FOLEY & LARDNER LLP
Counsel for Cross-Appellant